# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-2258

MAHMOUD CHERIF BASSIOUNI,

*Plaintiff-Appellant*,

v.

CENTRAL INTELLIGENCE AGENCY,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 4049—**Charles R. Norgle, Sr.**, *Judge*.

_____

ARGUED OCTOBER 26, 2004—DECIDED DECEMBER 8, 2004

_____

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Professor M. Cherif Bassiouni, a member of DePaul Law School's faculty since 1964, is the head of DePaul's International Human Rights Law Institute and a frequent participant in human-rights activities sponsored by the United States, the European Union, and the United Nations. In 1983 Bassiouni asked the Central Intelligence Agency for copies of all documents that mention him. The agency replied that it had some but would not reveal any details. In 1999 Bassiouni tried again, invoking both the Freedom of Information Act and the Privacy Act. Again the agency replied that it has documents

bearing his name. Some of these, the CIA stated, had come from the State Department, to which it dispatched copies. The State Department's catalog and partial disclosure of those copies satisfies Bassiouni. But he is dissatisfied with the CIA's refusal to hand over or even describe documents it generated internally or received from sources other than the State Department. The district court concluded that the CIA is entitled to keep mum. 2004 U.S. Dist. LEXIS 5290 (N.D. Ill. Mar. 30, 2004).

Both the FOIA and the Privacy Act contain exceptions for classified information. 5 U.S.C. §552(b)(1) (FOIA); 5 U.S.C. §552a(k) (Privacy Act). (Exemption 3, see §552(b)(3), likewise covers properly classified documents in light of the National Security Act, 50 U.S.C. §403, see *CIA v. Sims*, 471 U.S. 159 (1985), but we need not discuss it given exemption 1.) The Privacy Act also allows the CIA to exempt by regulation records in its possession. See 5 U.S.C. §552a(j)(1). The agency has used this authority, see 32 C.F.R. §1901.62, which leads Bassiouni to direct his fire against the CIA's invocation of exemptions to the FOIA. The agency does not contend that the *contents* of all documents mentioning Bassiouni are classified; it could hardly do so, given not only its refusal to identify which documents it holds but also the certainty that its files contain many U.N. reports, newspaper clippings, and other non-classified materials. Instead the agency maintains that providing a list of the documents that mention Bassiouni, and claiming document-by-document exemptions for those whose contents are classified, would reveal details about intelligence-gathering methods. These methods are classified independently of the information in materials the CIA collects. See Executive Order 12958 §1.5(c), (d), 60 Fed. Reg. 19825, 19827 (April 20, 1995). (Since this suit began, E.O. 12958 has been superseded by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003), but the substantive criteria pertinent to Bassiouni's situation are unchanged. See 68 Fed. Reg. 15317.)

It is easy to appreciate the basis of this concern. A list of documents could show clusters of dates that reveal when the agency acquired the information. Knowing which documents entered the files, and when, could permit an astute inference *how* the information came to the CIA's attention— and, in the intelligence business, "how" often means "from whom." A *Vaughn* index (named after *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)) thus could blow an agent's cover. Painstaking analysis of the patterns reflected in the agency's holdings might reveal that the person named in the request is *himself* a source of information. That would not be worrisome if people could request information only about themselves; Bassiouni knows whether he has ever been on the CIA's payroll (or has provided unpaid assistance). But any member of the public may invoke the FOIA, and the agency must disregard the requester's identity. See *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S 749, 771 (1989); *NLRB v. Sears, Roebuck & Co.*, 421 U.S 132, 149 (1975). Thus any information available to Bassiouni is available to North Korea's secret police and Iran's counterintelligence service too. These and other hostile entities would be greatly interested in learning who is assisting the CIA. Even allies could be unpleasantly surprised by information that discloses espionage operations. And when the dates, numbers, and general subjects of documents (the information required in a *Vaughn* index) would not help anyone learn who supplied the information, it could help them learn how the CIA is deploying its resources and what subjects it is investigating; that knowledge could be useful to both nations and terrorists.

Because lists of documents could assist foreign intelligence services—whose powers of inference and deduction rise with their own stock of information, which helps them to identify patterns that professors, newspaper reporters, and judges may miss—the CIA refuses to reveal its holdings. It does this even when disclosure could be innocuous.

There are two risks in disclosing when the request is harmless (as Bassiouni's may well be) and keeping silent when the CIA sees a danger. The first risk is that whoever makes the decision on behalf of the CIA may miss some clue that foreign intelligence services would catch, and thus inadvertently reveal secrets. The second risk is that people would draw an inference from disparate treatment: if, for example, the CIA opens its files most of the time and asserts the state-secrets privilege only when the information concerns a subject under investigation or one of its agents, then the very fact of asserting the exemption reveals that the request has identified a classified subject or source. When a pattern of responses itself reveals classified information, the only way to keep secrets is to maintain silence uniformly. And this is what the CIA has done. Today the agency's silence is called a "*Glomar* response," taking its name from the *Hughes Glomar Explorer*, a ship built (we now know) to recover a sunken Soviet submarine, but disguised as a private vessel for mining manganese nodules from the ocean floor. See *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976). Every appellate court to address the issue has held that the FOIA permits the CIA to make a "*Glomar* response" when it fears that inferences from *Vaughn* indexes or selective disclosure could reveal classified sources or methods of obtaining foreign intelligence. See, e.g., *Frugone v. CIA*, 169 F.3d 772 (D.C. Cir. 1999); *Minier v. CIA*, 88 F.3d 796 (9th Cir. 1996).

Bassiouni does not take issue with these decisions. Instead he contends that the CIA waived its right to make a *Glomar* response when it revealed that its files contain at least one document bearing his name. Instead of responding to the 1999 request with stony silence, the CIA conceded again that it had some responsive documents and made what it calls a "no number, no list" response, which amounts to the same thing: the requester gets no details. How this can be a "waiver" we do not grasp. See *Sims*, 471 U.S. at 180;

*Stein v. Department of Justice*, 662 F.2d 1245, 1259 (7th Cir. 1981). The risk to intelligence sources and methods comes from the details that would appear in a *Vaughn* index; it is these details—both the documents that appear in a list and the documents that the CIA might have gathered but did not—that permit crafty observers to infer what the CIA is investigating, what it has overlooked, and how (and from whom) it gleans information. Bassiouni does not contend that the statement "we have some responsive documents" let the cat out of the bag. Both the first response and the second response leave to the imagination whether there is a cat to let out. The public is as much in the dark about the agency's sources and methods as it ever was. And Bassiouni is better off under a system that permits the CIA to reveal some things (such as the documents routed to the State Department) without revealing everything; if even a smidgen of disclosure required the CIA to open its files, there would be no smidgens. See *Public Citizen v. Department of State*, 11 F.3d 198, 203 (D.C. Cir. 1993).

Perhaps it would be best to jettison the distinction between a "*Glomar* response" (refusing to acknowledge whether the CIA has even one responsive document) and a "no number, no list response" (acknowledging that the CIA has at least one responsive document but refusing to elaborate). Neither name has any magic; the statute and the executive order in combination, not the CIA's nomenclature, are dispositive. Because it is the *details* that could tip the agency's hand, they are what matter. From now on, a "Bassiouni response" could cover both situations, which are legally identical. Indeed, unless the CIA is willing to concede that its records system is like a roach motel—papers go in, but they don't come out—disclosure that the agency had some documents identifying a person in Year t does not imply that it still has them in Year t + n. The agency therefore could have made a flat *Glomar* response to Bassiouni's 1999 request. This shows that the *Glomar* response and the no number, no list

response are functionally identical and implies that the verbal distinction should be eliminated, lest it confuse or mislead requesters and judges into thinking that something depends on the turn of phrase.

Bassiouni advances a distinct argument under subsection (e)(7) of the Privacy Act, which says that an agency must "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity". 5 U.S.C. §552a(e)(7). He contends that between 1970 and 1975 the FBI investigated his political beliefs (including his criticism of American foreign policy) and shared with the CIA the results of this investigation. The CIA does not doubt that Bassiouni has made a sufficient preliminary showing that the FBI gathered information about Bassiouni's politics and has not replied that its maintenance of these records (if indeed it *is* maintaining them, which it will not confirm or deny) is authorized by any of the "unless" clauses in subsection (e)(7). It does not follow, however, that Bassiouni is entitled to a *Vaughn* index. Exemption 1 would not mean much if all anyone had to do, to see the full list of the CIA's holdings, was allege that the agency had some documents showing how he "exercises rights guaranteed by the First Amendment". Almost anyone whose activities come to the CIA's attention could make such an assertion.

Subsection (e)(7) says that the agency may not *maintain* records unless it meets certain conditions. It does not say that the agency must *disclose* records to the subject when that step would reveal classified intelligence sources and methods. See 5 U.S.C. §552a(g)(2), (4); *Irons v. Bell*, 596 F.2d 468, 470 (1st Cir. 1979). Bassiouni could have asked the district judge to order the CIA to reveal *in camera* what records (if any) it received from the FBI about Bassiouni between 1970 and 1975 (and has clung to for 30 years), and

either purge them from its files or give a statutory justification for keeping them. Yet Bassiouni has never made such a request—not of the CIA, not in the district court, and not in this court. He wants disclosure rather than erasure, and disclosure is the one thing that he cannot have.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*