# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 20, 2012          Decided March 15, 2013

No. 11-5320

AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL
LIBERTIES UNION FOUNDATION,
APPELLANTS

v.

CENTRAL INTELLIGENCE AGENCY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00436)

———

*Jameel Jaffer* argued the cause for appellants. With him on the briefs were *Ben Wizner* and *Arthur B. Spitzer*.

*Ranjana Natarajan* was on the brief for *amici curiae* The Bureau of Investigative Journalism, et al. in support of appellants.

*Stuart F. Delery*, Acting Assistant Attorney General, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, *Beth S. Brinkmann*, Deputy Assistant Attorney General, and *Matthew M. Collette* and *Catherine Y. Hancock*, Attorneys. *Douglas N. Letter* and *Sharon Swingle*, Attorneys, entered appearances.

Before: GARLAND, *Chief Judge*, and TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*:  The plaintiffs filed a Freedom of Information Act request for records held by the Central Intelligence Agency pertaining to the use of unmanned aerial vehicles ("drones") to carry out targeted killings.  The Agency issued a so-called *Glomar* response, refusing to confirm or deny that it had any such records.  The district court affirmed the Agency's response and granted summary judgment in its favor. The question on appeal is whether the Agency's *Glomar* response was justified under the circumstances of this case.  We conclude that it was not justified and therefore reverse and remand for further proceedings.

I

On January 13, 2010, the American Civil Liberties Union and American Civil Liberties Union Foundation (collectively, the ACLU) submitted a Freedom of Information Act (FOIA) request to the Central Intelligence Agency (CIA), seeking "records pertaining to the use of unmanned aerial vehicles ('UAVs') -- commonly referred to as 'drones' . . . -- by the CIA and the Armed Forces for the purpose of killing targeted individuals."  FOIA Request 2 (J.A. 48); *see* 5 U.S.C. § 552(a). The CIA responded with what is commonly known as a "*Glomar* response," declining either to confirm or deny the existence of any responsive records.[1]   The CIA's Agency

---

[1]The name is derived from the facts of *Phillippi v. CIA*, in which this court addressed the CIA's refusal to confirm or deny whether it had documents relating to Howard Hughes' ship, the Glomar Explorer,

Release Panel accepted an administrative appeal, but failed to make a determination within twenty days as FOIA requires. *See* 5 U.S.C. § 552(a)(6)(A)(ii). The ACLU then filed suit against the CIA in the United States District Court for the District of Columbia, seeking the immediate processing and release of the requested records. *See id.* § 552(a)(4)(B).

The CIA moved for summary judgment. It asserted that the answer to the question of whether it possessed responsive records was itself exempt from disclosure under FOIA Exemptions 1 and 3. *See id.* § 552(b)(1), (3). And it rejected the ACLU's contention that there had been official public acknowledgments that warranted overriding the Agency's exemption claims. In support of those arguments, the CIA submitted the affidavit of Mary Ellen Cole, the Information Review Officer for the Agency's National Clandestine Service, who explained at some length why the CIA believed its *Glomar* response was justified. *See* Declaration of Mary Ellen Cole (Cole Decl.).

On September 9, 2011, the district court granted the CIA's motion for summary judgment. *Am. Civil Liberties Union v. Dep't of Justice*, 808 F. Supp. 2d 280, 284 (D.D.C. 2011). The court agreed with the CIA that the existence *vel non* of responsive records was exempt under both Exemptions 1 and 3, and that there had been no official acknowledgment sufficient to override those exemptions. As a consequence, the court held, the CIA was not required to confirm or deny that it had any responsive records, let alone describe any specific documents it might have or explain why any such documents were exempt from disclosure. The ACLU filed a timely appeal.

---

which had reputedly been used in an attempt to recover a lost Soviet submarine. 546 F.2d 1009 (D.C. Cir. 1976); *see Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981).

4

II

This appeal concerns the intersection of two lines of FOIA cases.  The first is the *Glomar* line, which permits an agency to "refuse to confirm or deny the existence of records" in limited circumstances.  *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).  "Because *Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information, they are permitted only when confirming or denying the existence of records would itself 'cause harm cognizable under an FOIA exception.'"  *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011) (quoting *Wolf*, 473 F.3d at 374) (citation and internal quotation marks omitted); *see, e.g.*, *Miller v. Casey*, 730 F.2d 773, 775-78 (D.C. Cir. 1984); *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982).  Accordingly, "[i]n determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases."  *Wolf*, 473 F.3d at 374; *see, e.g.*, *Gardels*, 689 F.2d at 1103-07.

The second line of cases is the "official acknowledgment" line, which provides that when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information.  In other words, "'when information has been "officially acknowledged," its disclosure may be compelled even over an agency's otherwise valid exemption claim.'"  *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  A plaintiff mounting an official acknowledgment argument "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld."  *Id.*

(quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).

These two lines of cases converge when a plaintiff seeks to rebut a *Glomar* response by establishing official acknowledgment. In the *Glomar* context, the "specific information" at issue is not the contents of a particular record, but rather "the existence *vel non*" of any records responsive to the FOIA request. *Id.* at 379 (emphasis omitted); *see id.* at 380. Accordingly, the plaintiff can overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect. *See id.* at 379-80; *Marino v. DEA*, 685 F.3d 1076, 1081 (D.C. Cir. 2012). As we have explained, "in the context of a *Glomar* response, the public domain exception is triggered when 'the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request,' regardless whether the contents of the records have been disclosed." *Marino*, 685 F.3d at 1081 (quoting *Wolf*, 473 F.3d at 379).

"Under the FOIA, 'the burden is on the agency to sustain its action,' 5 U.S.C. § 552(a)(4)(B), and we review *de novo* the agency's use of a FOIA exemption to withhold documents." *Wolf*, 473 F.3d at 374. However, "in conducting *de novo* review in the context of national security concerns, courts 'must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Id.* (quoting *Miller*, 730 F.2d at 776) (internal quotation marks omitted). "Ultimately, an agency's justification for invoking a FOIA exemption," whether directly or in the form of a *Glomar* response, "is sufficient if it appears 'logical' or 'plausible.'" *Id.* at 374-75; *see Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012); *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011); *see also* CIA Br. 19

(acknowledging that "[t]he same standard applies when the Government issues a *Glomar* response").

In the district court, the CIA argued that it could neither confirm nor deny that it had responsive documents because confirming that it did would reveal that the CIA was either involved in, or interested in, drone strikes (while denying that it did would reveal the opposite). According to the Agency, its involvement or interest in such strikes is exempt from disclosure under FOIA Exemptions 1 and 3.[2] On behalf of the Agency, Mary Ellen Cole declared that "[a]n official CIA acknowledgment that confirms or denies the existence or nonexistence of records responsive to Plaintiffs' FOIA request would reveal, among other things, whether or not the CIA is involved in drone strikes or at least has an intelligence interest in drone strikes." Cole Decl. ¶ 12; *see id.* ¶ 19. "[T]he existence or nonexistence of CIA records responsive to this request," she continued, "is a currently and properly classified fact, the disclosure of which reasonably could be expected to cause damage to the national security." *Id.* ¶ 15. And she further averred that, "[c]ontrary to Plaintiffs' suggestion, no authorized CIA or Executive Branch official has disclosed whether or not

---

[2]Exemption 1 permits the government to withhold information "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy," if that information has been "properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Exemption 3 permits the government to withhold information "specifically exempted from disclosure by statute," if such statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." *Id.* § 552(b)(3). The government relies on the National Security Act of 1947 and the Central Intelligence Agency Act of 1949 as the relevant withholding statutes under Exemption 3. *See* 50 U.S.C. §§ 403-1(i)(1), 403g.

the CIA possesses records regarding drone strikes or whether or not the CIA is involved in drone strikes or has an interest in drone strikes." *Id.* ¶ 43; *see id.* ¶ 45.

In response, the ACLU argued both that: (1) the mere existence or nonexistence of records responsive to its requests was not exempt under FOIA Exemption 1 or 3; and (2) even if it were, the existence of such records had already been officially acknowledged by prior disclosure. The district court rejected both arguments. *See Am. Civil Liberties Union*, 808 F. Supp. 2d at 287-93, 298-301; *id.* at 293-98. On appeal, the ACLU pursues only the second argument. Accordingly, that is the only argument we consider, and we consider it *de novo*. *See Elec. Privacy Info. Ctr.*, 678 F.3d at 930.

## III

For reasons that will become clear in a moment, the CIA did not justify its *Glomar* response by contending that it was necessary to prevent disclosing whether or not the *United States* engages in drone strikes. Rather, as we have noted, the response was justified on the ground that it was necessary to keep secret whether the *CIA itself* was involved in, or interested in, such strikes. Although the Agency's brief repeatedly emphasizes the first prong of this justification -- protecting whether the CIA operates drones -- that is not the issue before us on this appeal. The plaintiffs requested the release of ten categories of documents pertaining to drone strikes, each of which sought documents about drones, but none of which was limited to drones operated by the CIA. FOIA Request 5-8 (J.A. 51-54); *see* Cole Decl. ¶ 7 (noting that plaintiffs' request sought "records pertaining to the use of . . . 'drones' . . . by the CIA *and*

*the Armed Forces*" (emphasis added)).[3]   Nor was the CIA's *Glomar* response limited to documents about drones operated by the Agency.   Rather, the CIA asserted and the district court upheld a sweeping *Glomar* response that ended the plaintiffs' lawsuit by permitting the Agency to refuse to say whether it had *any documents at all* about drone strikes.   *See Am. Civil Liberties Union*, 808 F. Supp. 2d at 287, 301.

The CIA has proffered no reason to believe that disclosing whether it has any documents at all about drone strikes will reveal whether the Agency itself -- as opposed to some other U.S. entity such as the Defense Department -- operates drones.[4] There is no doubt, however, that such disclosure would reveal whether the Agency "at least has an intelligence interest in drone strikes." Cole Decl. ¶ 12; *see id.* ¶ 19.  The question before us, then, is whether it is "logical or plausible," *Wolf*, 473 F.3d at 375 (internal quotation marks omitted), for the CIA to contend that it would reveal something not already officially acknowledged to say that the Agency "at least has an

---

[3]*See* ACLU Reply Br. 1 n.1 (confirmation by plaintiffs that their FOIA request was for documents relating to the use of drones to carry out targeted killings, not only for documents relating to the use of such drones by the CIA); Oral Arg. Tr. 17.

[4]There might be a reason if it were unlikely that any entity other than the CIA operates drones.  But the CIA does not make that argument.  To the contrary, the Agency itself notes the possibility that official acknowledgments of U.S. drone strikes may refer to operations of "another federal entity such as the Department of Defense."  CIA Br. 40.  *See also* Robert M. Gates, *Remarks by Secretary Gates at the United States Air Force Academy*, U.S. DEP'T OF DEF. (Mar. 4, 2011), http://www.defense.gov/transcripts/transcript.aspx?transcriptid=4779 ("The Air Force now has 48 Predator and Reaper combat air patrols currently flying . . . and is training more pilots for advanced UAVs than for any other single weapons system.").

intelligence interest" in such strikes. Given the extent of the official statements on the subject, we conclude that the answer to that question is no.

The President of the United States has himself publicly acknowledged that the United States uses drone strikes against al Qaeda. In response to a question about drone strikes on a live internet video forum, the President said:

> I think that we have to be judicious in how we use drones. But understand that probably our ability to respect the sovereignty of other countries . . . is enhanced by the fact that we are able to pinpoint-strike an al Qaeda operative in a place where the capacities of th[e] military in that country may not be able to get them. So obviously a lot of these strikes have been . . . going after al Qaeda suspects who are up in very tough terrain along the border between Afghanistan and Pakistan.[5]

Similarly, in a speech at the Woodrow Wilson International Center, the President's counterterrorism advisor, then-Assistant to the President for Homeland Security and Counterterrorism John Brennan, said:

> So let me say it as simply as I can. Yes, in full accordance with the law . . . the United States Government conducts targeted strikes against specific

---

[5] *President Obama Hangs out with America*, WHITE HOUSE BLOG (Jan. 30, 2012), http://www.whitehouse.gov/blog/2012/01/30/president-obama-hangs-out-america; The White House, *Your Interview with the President - 2012*, YOUTUBE, at 28:37-29:23 (Jan. 30, 2012), http://www.youtube.com/watch?v=eeTj5qMGTAI; *see id.* at 26:20-30:18.

al-Qaida terrorists, sometimes using remotely piloted aircraft, often referred to publicly as drones. And I'm here today because President Obama has instructed us to be more open with the American people about these efforts.[6]

Although these statements do not acknowledge that the CIA itself operates drones, they leave no doubt that some U.S. agency does. The CIA does not dispute that these statements qualify as official acknowledgments of at least that much. Oral Arg. Tr. 25-26. To the contrary, it concedes that "Mr. Brennan officially acknowledged that the United States conducts drone strikes," albeit without "reveal[ing] whether the *CIA* (as opposed to another federal entity such as the Department of Defense) is involved in these drone strikes." CIA Br. 40.[7]

---

[6]John O. Brennan, *The Ethics and Efficacy of the President's Counterterrorism Strategy*, WILSON CENTER (Apr. 30, 2012), http://www.wilsoncenter.org/event/the-efficacy-and-ethics-us-counterterrorism-strategy [hereinafter Wilson Center Speech]; *see id.* ("The United States is the first nation to regularly conduct strikes using remotely piloted aircraft in an armed conflict.")

[7]We have permitted agencies to give a *Glomar* response despite the prior disclosure of another, unrelated agency. *See, e.g.*, *Frugone v. CIA*, 169 F.3d 772, 774-75 (D.C. Cir. 1999) (upholding the CIA's ability to make a *Glomar* response despite official disclosure of the same information by the Office of Personnel Management). That rule does not apply, however, where the disclosures are made by an authorized representative of the agency's parent. *See Marino*, 685 F.3d at 1082 (disallowing a *Glomar* response by the DEA where a U.S. Attorney released documents because both are "component[s] *within* the Department of Justice"); *see id.* (noting the court's holding in *Davis v. Department of Justice* that "the FBI -- likewise part of DOJ -- could not withhold the specific portions of recordings that the plaintiff showed were played in federal court" by a federal prosecutor)

Given these official acknowledgments that the United States has participated in drone strikes, it is neither logical nor plausible for the CIA to maintain that it would reveal anything not already in the public domain to say that the Agency "at least has an intelligence interest" in such strikes, Cole Decl. ¶ 12. The defendant is, after all, the Central *Intelligence* Agency. And it strains credulity to suggest that an agency charged with gathering intelligence affecting the national security does not have an "intelligence interest" in drone strikes, even if that agency does not operate the drones itself.

But there is more. Counterterrorism advisor Brennan did not merely acknowledge that the United States "regularly conduct[s] strikes using remotely piloted aircraft." Wilson Center Speech. He also stated that, in deciding whether to carry out a strike, "[w]e . . . draw[] on the full range of our intelligence capabilities" and "may ask the intelligence community to . . . collect additional intelligence or refine its analysis so that a more informed decision can be made." *Id.* "We listen to departments and agencies across our national security team," he said, and "don't just hear out differing views, we ask for them and encourage them." *Id.* Needless to say, by statutory definition the Central Intelligence Agency is part of "the full range" of the nation's "intelligence capabilities." *See* 50 U.S.C. §§ 403-4, 403-4a.

And there is still more. In 2009, then-Director of the CIA Leon Panetta delivered remarks at the Pacific Council on International Policy. In answer to a question about "remote

---

(citing *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279-82 (D.C. Cir. 1992)). A disclosure made by the President, or by his counterterrorism advisor acting as "instructed" by the President, falls on the "parent agency" side of that line.

drone strikes" in the tribal regions of Pakistan, Director Panetta stated:

> [O]bviously because these are covert and secret operations I can't go into particulars. I think it does suffice to say that these operations have been very effective because they have been very precise in terms of the targeting and it involved a minimum of collateral damage. . . . I can assure you that in terms of that particular area, it is very precise and it is very limited in terms of collateral damage and, very frankly, it's the only game in town in terms of confronting and trying to disrupt the al-Qaeda leadership.[8]

It is hard to see how the CIA Director could have made his Agency's knowledge of -- and therefore "interest" in -- drone strikes any clearer. And given these statements by the Director, the President, and the President's counterterrorism advisor, the Agency's declaration that "no authorized CIA or Executive Branch official has disclosed whether or not the CIA . . . has an interest in drone strikes," Cole Decl. ¶ 43; *see* CIA Br. 43, is at this point neither logical nor plausible.

It is true, of course, that neither the President nor any other official has specifically stated that the CIA has *documents* relating to drone strikes, as compared to an *interest* in such strikes. At this stage of this case, however, those are not distinct issues. The only reason the Agency has given for refusing to disclose whether it has documents is that such disclosure would reveal whether it has an interest in drone strikes; it does not

---

[8]*Director's Remarks at the Pacific Council on International Policy*, CENT. INTELLIGENCE AGENCY (May 19, 2009), https://www.cia.gov/news-information/speeches-testimony/directors-remarks-at-pacific-council.html.

13

contend that it has a reason for refusing to confirm or deny the existence of documents that is independent from its reason for refusing to confirm or deny its interest in that subject. And more to the point, as it is now clear that the Agency does have an interest in drone strikes, it beggars belief that it does not also have documents relating to the subject.[9]

But again, there is more. In the above-quoted excerpt from the CIA Director's Pacific Council remarks, the Director spoke directly about the precision of targeted drone strikes, the level of collateral damage they cause, and their usefulness in comparison to other weapons and tactics. Given those statements, it is implausible that the CIA does not possess a single document on the subject of drone strikes. Unless we are to believe that the Director was able to "assure" his audience that drone strikes are "very precise and . . . very limited in terms of collateral damage" without having examined a single document in his agency's possession, those statements are tantamount to an acknowledgment that the CIA has documents on the subject. In short, although the President and Messrs. Brennan and Panetta did not say that the CIA possesses responsive documents, what they did say makes it neither "logical" nor "plausible" to maintain that the Agency does not have any documents relating to drones.[10]

---

[9]Compare *Moore v. CIA*, 666 F.3d 1330 (D.C. Cir. 2011), which upheld the CIA's *Glomar* response to a request for "all information or records relevant to . . . Sveinn B. Valfells," notwithstanding the CIA's official acknowledgment that it "asked the FBI to redact some 'CIA-originated information'" from a report on Valfells, because the plaintiff could not "show that the redacted information even relates to Valfells." *Id.* at 1331, 1333-34.

[10]Although the statements by the President and Mr. Brennan postdated the district court's grant of summary judgment, the CIA does not argue that we may not take judicial notice of them on appeal.

The *Glomar* doctrine is in large measure a judicial construct, an interpretation of FOIA exemptions that flows from their purpose rather than their express language. In this case, the CIA asked the courts to stretch that doctrine too far -- to give their imprimatur to a fiction of deniability that no reasonable person would regard as plausible. "There comes a point where . . . Court[s] should not be ignorant as judges of what [they] know as men" and women. *Watts v. Indiana*, 338 U.S. 49, 52 (1949) (opinion of Frankfurter, J.). We are at that point with respect to the question of whether the CIA has any documents regarding the subject of drone strikes.

Indeed, the CIA itself now appears to have recognized the indefensibility of its position. Shortly after filing its appellate brief defending its *Glomar* response in this case, the Agency filed pleadings in litigation in the Southern District of New York acknowledging that it does have documents concerning targeted killings. Declaration of John Bennett ¶¶ 17, 27, *New York Times Co. v. U.S. Dep't of Justice*, No. 11-cv-9336, 2013 WL 50209 (S.D.N.Y. Jan. 3, 2013) (Bennett Decl.). It gave as examples two public speeches on the subject, one by Attorney General Eric Holder, and the other the remarks of counterterrorism advisor John Brennan that we have quoted above. *Id.* ¶ 27. Thereafter, the Agency filed a motion for remand in this case, stating that the New York filing "officially acknowledges the CIA's possession of some records that could potentially be responsive to plaintiffs' FOIA requests in this case as well." Remand Mot. 4. The motion went on to hint that the Agency might abandon its *Glomar* response in favor of something less absolute, if only slightly less. *See id.* at 5.

The CIA's New York filing was unclear as to whether it was acknowledging that the Agency had anything responsive to the requests in that case beyond the two public speeches it noted. At oral argument in this case, CIA counsel appeared to

acknowledge that it did. Oral Arg. Tr. 33-35. Even if we are overreading that acknowledgment, however, the official statements of the President and Messrs. Brennan and Panetta render it impossible to believe that those two speeches are the only documents related to drone strikes in the Agency's files. Accordingly, the CIA's broad *Glomar* response is untenable, and we therefore reverse the district court's judgment dismissing the plaintiffs' FOIA action.[11]

IV

The collapse of the CIA's *Glomar* response does not mark the end of this case. FOIA contains exemptions, including particularly Exemptions 1 and 3, that the government argues permit withholding. "To determine whether the *contents* -- as distinguished from the *existence* -- of the officially acknowledged records may be protected from disclosure by Exemptions 1 and 3[,] . . . we [must] remand the case to the district court" for further proceedings. *Wolf*, 473 F.3d at 380; *see Marino*, 685 F.3d at 1082-83. With the failure of the CIA's broad *Glomar* response, the case must now proceed to the filing of a *Vaughn* index or other description of the kind of documents the Agency possesses, followed by litigation regarding whether the exemptions apply to those documents. *See generally Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). This has not occurred here because, by accepting the CIA's *Glomar* response, the district court permitted the Agency to end the litigation

---

[11]Because the ACLU does not make the argument on appeal, we do not consider whether -- in light of those official statements -- a *Glomar* response would also be unwarranted on the ground that it is implausible that revealing that the CIA merely has an interest in drone strikes "would cause harm cognizable under [a] FOIA exception." *Wolf*, 473 F.3d at 374.

without acknowledging the existence of any responsive documents, let alone indicating their nature or contents.

Just how detailed a disclosure must be made, even in an index, is another matter. A *Vaughn* index indicates in some descriptive way which documents the agency is withholding and which FOIA exemptions it believes apply. As the plaintiffs acknowledge, there is no fixed rule establishing what a *Vaughn* index must look like, and a district court has considerable latitude to determine its requisite form and detail in a particular case. Oral Arg. Tr. 57-58 (plaintiffs' acknowledgment that the district court has "a lot of leeway" in determining the degree of detail required in a *Vaughn* index); *see Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 145-46 (D.C. Cir. 2006); *Tax Analysts v. IRS*, 214 F.3d 179, 185 (D.C. Cir. 2000). In the usual case, the index is public and relatively specific in describing the kinds of documents the agency is withholding. *See Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1465 (D.C. Cir. 1984); *Hayden v. NSA*, 608 F.2d 1381, 1384-85 (D.C. Cir. 1979). But a *Vaughn* index may also contain brief or categorical descriptions when necessary to prevent the litigation process from revealing the very information the agency hopes to protect. *Judicial Watch*, 449 F.3d at 146.[12] "Indeed, an agency may even submit other measures in combination with or in lieu of the index itself. Among other things, the agency may submit supporting affidavits or seek *in camera* review of some or all of the documents." *Id.* at 146 (citation omitted); *see Tax Analysts*, 214 F.3d at 185. And in some circumstances, the court may permit

---

[12]*See Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994) ("[T]he government need not justify its withholdings document-by-document; it may instead do so category-of-document by category-of-document, so long as its definitions of relevant categories are sufficiently distinct to allow a court to determine . . . whether the specific claimed exemptions are properly applied." (internal quotation marks omitted)).

*in camera* submission of the index itself. *See Hayden*, 608 F.2d at 1385 (finding *in camera* review appropriate where "public itemization and detailed justification would compromise legitimate secrecy interests"). In short, "'[t]he materials provided by the agency may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege.'" *Gallant*, 26 F.3d at 173 (quoting *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 128 (D.C. Cir. 1987)).

In the New York litigation, the CIA said that it did not want to file a *Vaughn* index at all, but instead submit what it called a "no number, no list" response -- acknowledging that it had responsive documents, but declining to "further describe or even enumerate on the public record the number, types, dates, or other descriptive information about these responsive records." Bennett Decl. ¶ 28. Although the CIA's New York filings speak as if the notion of a "no number, no list" response is well-established, it has not previously been considered by this court. Indeed, at the time of those filings, there were only two previously reported instances of such a response: it was briefly mentioned in one district court case in this circuit, *Jarvik v. CIA*, 741 F. Supp. 2d 106, 123 (D.D.C. 2010), and was litigated once before the Seventh Circuit, *Bassiouni v. CIA*, 392 F.3d 244, 246-47 (7th Cir. 2004). There are now two more reported instances: another brief mention by a district court in this circuit, *Nat'l Sec. Counselors v. CIA*, No. 11-443, 2012 WL 4903377, at *38 (D.D.C. Oct. 17, 2012), and the district court's recent grant of summary judgment in favor of the CIA in the New York litigation, *New York Times Co. v. U.S. Dep't of Justice*, No. 11-cv-9336, 2013 WL 50209 (S.D.N.Y. Jan. 3, 2013).

Citing the Seventh Circuit's view that a "no number, no list" response is "legally identical" to a *Glomar* response, *Bassiouni*, 392 F.3d at 247, the plaintiffs argue that, if the CIA

is not entitled to make a *Glomar* response in this case, it is also not entitled to make a "no number, no list" response. Pls.-Appellants' Opp'n to Remand Mot. 4-5. At least in a case like this, however, there is a material difference between a "no number, no list" response and a *Glomar* response. A *Glomar* response requires the agency to argue, and the court to accept, that the very fact of the existence or nonexistence of responsive records is protected from disclosure. That is conceptually different from conceding (or being compelled by the court to concede) that the agency has some documents, but nonetheless arguing that any description of those documents would effectively disclose validly exempt information. There may be cases where the agency cannot plausibly make the former (*Glomar*) argument with a straight face, but where it can legitimately make the latter.

Indeed, a "no number, no list" response might be viewed as a kind of *Vaughn* index, albeit a radically minimalist one. Such a response would only be justified in unusual circumstances, and only by a particularly persuasive affidavit. Nor is there any reason to regard this approach as subject to an on/off switch. As we have just noted, once an agency acknowledges that it has some responsive documents, there are a variety of forms that subsequent filings in the district court may take. A pure "no number, no list" response is at one end of that continuum; a traditional *Vaughn* index is at the other. Not quite as minimalist as a pure "no number, no list" response might be a "no number, no list" response (or even a *Glomar* response) with respect to a limited category of documents, coupled with a *Vaughn* index for the remainder.

But we are getting ahead of ourselves. None of these issues has been litigated in this case, either in this court or in the district court, because summary judgment was granted in the

face of an unqualified, across-the-board *Glomar* response.[13] No government affidavit has yet been filed in this case that even attempts to justify a "no number, no list" response. And neither a traditional *Vaughn* index nor affidavits justifying an alternative submission have been filed. Accordingly, all such issues remain open for the district court's determination upon remand.

V

For the foregoing reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

[13]For this reason, we also do not decide whether the government would be warranted in making a more limited *Glomar* response to one or more of the specific categories of documents "pertaining to drone strikes" included in the plaintiffs' FOIA request.