# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 12, 2020       Decided February 9, 2021

No. 20-5002

JASON LEOPOLD AND BUZZFEED, INC.,
APPELLEES

v.

CENTRAL INTELLIGENCE AGENCY,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-00978)

*Joseph F. Busa*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs was *Sharon Swingle*, Attorney.

*Jeffrey L. Light* argued the cause and filed the brief for appellee.

Before: WILKINS and KATSAS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Jason Leopold and BuzzFeed[1] requested the Central Intelligence Agency to disclose certain records. The Agency declined. The case is here on the Agency's appeal from the district court's order requiring it to confirm or deny whether it has the records.

I

The plaintiffs based their request on the Freedom of Information Act. The Act compels disclosure of government records. 5 U.S.C. § 552(a)(3)(A). There are nine exemptions. 5 U.S.C. § 552(b). Two matter here.

Exemption 1 covers "matters"[2] that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order[.]" 5 U.S.C. § 552(b)(1). Thus, properly classified records are exempt from disclosure. *See* Exec. Order No. 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010) (governing the classification of national security information).

Exemption 3 covers "matters" that are "specifically exempted from disclosure by statute[.]" 5 U.S.C. § 552(b)(3). Relevant here, the National Security Act of 1947 "qualifies as a withholding statute under Exemption 3," *CIA v. Sims*, 471 U.S. 159, 167 (1985), and directs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). By delegation, the Director of the Central Intelligence Agency must

---

[1] Buzzfeed "is a social news and entertainment company." J.A. 4.

[2] While § 552(a)(3)(A) provides for the disclosure of "records," the exemptions of § 552(b) cover "matters."

do the same.  *DiBacco v. U.S. Army*, 795 F.3d 178, 196–99 (D.C. Cir. 2015).

The absence of particular evidence may sometimes provide clues as important as the presence of such evidence.  In literature, a common way of expressing this truth, although not always accurately, is to refer to the dog that did not bark.[3]  In Freedom of Information Act law, a similar concept justifies what has become known as the *Glomar* response.

Our court has long recognized that the existence of agency records relating to a subject, or the absence of such agency records, may reveal information falling within one of these exemptions.  *See Am. C.L. Union v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013) (*"ACLU"*); *Wolf v. CIA*, 473 F.3d 370, 374

---

[3] The idiom is derived from Arthur Conan Doyle's *Silver Blaze* (1892), reprinted in II THE ANNOTATED SHERLOCK HOLMES 261 (1967, Wm. S. Baring-Gould ed.).

A famous race horse – "Silver Blaze" – has disappeared the night before an important race and the horse's trainer has been killed. The following dialog concerns a dog kept at the stable.  Colonel Ross, the owner of "Silver Blaze," questions Sherlock Holmes about the progress of his investigation (*id.* at 277):

Colonel Ross: "Is there any other point to which you would wish to draw my attention?"
Sherlock Holmes: "To the curious incident of the dog in the night-time."
Colonel Ross: "The dog did nothing in the night-time."
Sherlock Holmes: "That was the curious incident."

Holmes solves the mystery and explains the clue: because the dog had not barked, "the midnight visitor [to the stable] was someone whom the dog knew well."  *Id.* at 280.

(D.C. Cir. 2007); *Phillippi v. CIA*, 546 F.2d 1009, 1013–14 (D.C. Cir. 1976). If so, an agency "may refuse to confirm or deny the existence of records" — a *Glomar* response.[4] *Wolf*, 473 F.3d at 374 (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)). A requester can overcome an agency's otherwise valid *Glomar* response by showing that the agency has officially and publicly acknowledged the records' existence. *ACLU*, 710 F.3d at 427; *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990); *Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983)).[5]

Against this backdrop, we address the impact of President Trump's "tweet"[6] on July 24, 2017, stating: "The Amazon Washington Post fabricated the facts on my ending massive, dangerous, and wasteful payments to Syrian rebels fighting Assad....." Donald J. Trump (@realDonaldTrump), Twitter

---

[4] The name comes from the Central Intelligence Agency's refusal to confirm or deny the existence of records about a ship named the *Hughes Glomar Explorer*, which reportedly engaged in a covert mission to raise "a sunken Soviet submarine" from the depths of the Pacific Ocean. *Mil. Audit Project v. Casey*, 656 F.2d 724, 728 (D.C. Cir. 1981); *Phillippi*, 546 F.2d at 1010–11.

[5] Once an agency has officially acknowledged that records exist, there is no value in a *Glomar* response. The secret is out. But if the existence is still a mystery and the court agrees with the *Glomar* response, the case is at an end. The agency does not need to claim exemptions for the contents of the records (if any). *See Moore v. CIA*, 666 F.3d 1330, 1333–34 (D.C. Cir. 2011).

[6] "Tweeting" is the act of posting a character-limited message (a "tweet") on Twitter, a social media and micro-blogging service. *United States v. Feng Ling Liu*, 69 F. Supp. 3d 374, 376 n.1 (S.D.N.Y. 2014).

5

(July 24, 2017, 10:23 PM).[7]

Shortly thereafter, Jason Leopold and BuzzFeed (collectively, "BuzzFeed") requested the Central Intelligence Agency's records about Agency "payments to Syrian rebels fighting Assad." J.A. 45. The Agency issued a *Glomar* response, supported by a sworn declaration, invoking Exemptions 1 and 3. BuzzFeed sued, arguing that President Trump's tweet had officially acknowledged the existence of Agency payments to Syrian rebels. *Leopold v. CIA*, 380 F. Supp. 3d 14, 22 (D.D.C. 2019) (*"Leopold I"*). Both parties sought summary judgment. *Id.*

In *Leopold I*, the district court granted summary judgment to the Agency, explaining that "the President's tweet did not mention the [Agency] or create any inference that such a program would be linked to or run by the [Agency]." *Id.* at 25. The district court reasoned that "[t]he President might have acknowledged the existence of 'massive, dangerous, and wasteful' payments to Syrian rebels, but he did not mention from which branch of government such payments would have originated." *Id.*

The request from *Leopold I* is not at issue. BuzzFeed later sent another request, this time seeking nine broad categories of Agency records. Although the first request sought Agency records relating to *Agency* payments to Syrian rebels, the second request sought Agency records relating to *payments* to Syrian rebels. *Compare* J.A. 45, *with* J.A. 24.

---

[7] The tweet does not identify the Washington Post article, but Buzzfeed claims it was an article by Greg Jaffe and Adam Entous entitled *Trump Ends Covert CIA Program to Arm Anti-Assad Rebels in Syria, a Move Sought by Moscow*, Wash. Post (July 19, 2017).

Again, the Agency issued a *Glomar* response.  In another sworn declaration, the Agency asserted that a response would reveal whether it had an intelligence interest in, intelligence sources about, and connection to payments or programs related to Syrian rebels — information exempt from disclosure under Exemptions 1 and 3.  No one disputes the validity of the exemptions.  Oral Arg. 31:43–31:53.  And again, BuzzFeed sued, alleging that the President's tweet had officially acknowledged the existence of such records.  Both sides moved for summary judgment. *Leopold v. CIA*, 419 F. Supp. 3d 56, 63 (D.D.C. 2019) (*"Leopold II"*).

This time around, the district court granted summary judgment to BuzzFeed, holding that President Trump's tweet had officially acknowledged "the government's intelligence interest in the broader categories of records that BuzzFeed has requested." *Id.* at 68.  Having overcome the Agency's *Glomar* response, the district court ordered the Agency to respond. *Id.* at 68–69.  The Agency appealed.

II

We first address our appellate jurisdiction.  The district court's order may not be a "final decision" appealable under 28 U.S.C. § 1291. *See Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 128 (D.C. Cir. 2005) (citing *Se. Fed. Power Customers, Inc. v. Harvey*, 400 F.3d 1, 4 (D.C. Cir. 2005)).  But it is an appealable order under 28 U.S.C. § 1292(a)(1), which extends our jurisdiction to include "[i]nterlocutory orders of the district courts . . . granting . . . injunctions[.]" *Id.*

There is no doubt that orders requiring "the disclosure of documents" are appealable injunctions. *See, e.g.*, *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d at 128; *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 532 F.3d 860, 863 (D.C. Cir. 2008) (*"CREW"*).  Buzzfeed claims the order

here is different because the district court did not require the Agency to disclose any documents.  This misses the point.  What matters for jurisdictional purposes under 28 U.S.C. § 1292(a)(1) is whether the district court has issued an injunction, not whether the injunction requires documents to be disclosed.

*CREW* is not to the contrary. There, the Secret Service refused to produce visitor logs because it believed that the logs did not qualify as agency records.  532 F.3d at 862.  Rejecting that argument, the district court ordered the Secret Service to "process [CREW]'s Freedom of Information Act request and produce all responsive records that are not exempt from disclosure[.]"  *Id.*  We lacked interlocutory jurisdiction because "the Secret Service may yet be entitled to withhold some or all of the documents under one or more of [the Act's] nine exemptions."  *Id.* at 863; *see Green v. Dep't of Com.*, 618 F.2d 836, 839 (D.C. Cir. 1980).  In other words, the consequences of the district court's order would not be known until the Secret Service processed CREW's request.  The court put it this way: "Under the court's order, the Secret Service will have to search for and locate any responsive documents and claim any exemptions it believes applicable.  At that point, the court may agree with the agency, allowing it to withhold the requested records, in which case the government would have no cause to appeal.  Or alternatively, 'the issues might be sufficiently narrowed to permit the parties to reach a settlement.'  In either case, appellate review at this stage is premature."  *Id.* at 864 (quoting *Green*, 618 F.2d at 839).

An order denying a *Glomar* response and requiring the agency to reveal whether it holds particular records is not comparable.  The appeal from such an order is by no means "premature."  If the order goes into effect and forces the agency to reveal whether it possessed the records, any later agency appeal would be fruitless.  *See Wolf*, 473 F.3d at 379.  That cat

would be out of the bag, regardless whether any relevant documents the agency might possess would be exempt from disclosure.

Here, the records' existence (or not) is a properly classified fact and one that would reveal intelligence sources and methods. As our court stated in the original "*Glomar*" case: "In effect, the situation is as if [the plaintiff] had requested and been [granted] permission to see a document which says either 'Yes, we have records relating to contacts with the media concerning the Glomar Explorer' or 'No, we do not have any such records.'" *Phillippi*, 546 F.2d at 1012.

To sum up, the contents of the records (if any) may be exempt from disclosure. *See Wolf*, 473 F.3d at 380. But the district court has ordered the release of information "for which the [Agency] claim[s] no basis for non-disclosure beyond the argument already rejected." *Jud. Watch*, *Inc. v. U.S. Dep't of Energy*, 412 F.3d at 128. As such, the court's order is injunctive in nature and appealable under 28 U.S.C. § 1292(a)(1).

## III

We would uphold the district court's ruling, even on *de novo* review, if President Trump's tweet officially acknowledged the existence of Central Intelligence Agency records (and, therefore, intelligence interest and capabilities) about payments to Syrian rebels.[8]  To find official

---

[8] We do not address BuzzFeed's argument that the President's interview with the Wall Street Journal was also an official acknowledgment.  BuzzFeed did not raise this claim in the district court. *See* Pls.' Cross Mot. for Summ. J., ECF No. 12 at 1 n.1 ("[T]he only question the Court needs to address is the impact of the tweet on what would otherwise have been a valid Glomar response."); *Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009). Buzzfeed

acknowledgment, under our precedents, three prerequisites must be met: "the information requested must be as specific as the information previously released," "match the information previously disclosed," and "already have been made public through an official and documented disclosure." *Fitzgibbon*, 911 F.2d at 765 (quoting *Afshar*, 702 F.2d at 1133). "In the *Glomar* context, then, if the prior disclosure establishes the *existence* (or not) of records responsive to the [information] request, the prior disclosure necessarily matches both the information at issue . . . and the specific request for that information." *Wolf*, 473 F.3d at 379. This test is "strict." *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (citing *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009)).

The initial burden rests with the requester, who must "point[] to specific information in the public domain that appears to duplicate that being withheld." *ACLU*, 710 F.3d at 427 (quoting *Wolf*, 473 F.3d at 378). "An agency's official acknowledgment . . ., however, cannot be based on mere public speculation, no matter how widespread." *Wolf*, 473 F.3d at 378 (citing *Afshar*, 702 F.2d at 1130). And for good reason: "it is one thing for a reporter or author to speculate or guess that a thing may be so . . .; it is quite another thing for one in a position to know of it officially to say that it is so." *Fitzgibbon*, 911 F.2d at 765 (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362,

---

did argue in the district court that the President's interview with the Wall Street Journal bolsters Buzzfeed's interpretation of the tweet as disclosing the existence of payments to Syrian rebels. *See* Pls.' Cross Mot. for Summ. J. at 6. But for the reasons given *infra* and in *N.Y. Times v. CIA*, 965 F.3d 109, 118 (2d Cir. 2020), we find that even considered alongside the President's interview with the Wall Street Journal, the President's tweet lacks the requisite specificity to constitute an official acknowledgment of the Agency's intelligence interest in payments or programs related to Syrian rebels.

1370 (4th Cir. 1975)) (brackets omitted). "[I]n the absence of any official acknowledgment, . . . foreign governments would be left guessing[.]" *Ameziane v. Obama*, 699 F.3d 488, 492 (D.C. Cir. 2012). Here, the plaintiffs have failed to satisfy their burden.

The Agency claims that President Trump's tweet lacks sufficient specificity to qualify as an "official acknowledgment" that the records exist. BuzzFeed's contrary argument is two-tiered. The first is that the President's tweet officially acknowledged the existence of some program providing payments to Syrian rebels. BuzzFeed principally points to the tweet's adjectives ("massive, dangerous, and wasteful") and the possessive "my" to support this reading. Second, because of that alleged disclosure, BuzzFeed asserts that it is an "ineluctable conclusion . . . that the [Agency] possesses records relating to such payments, or at least to the ending of such payments." Appellee Br. 31.

Did President Trump's tweet officially acknowledge the existence of a program? Perhaps. Or perhaps not. And therein lies a problem. *See Gardels*, 689 F.2d at 1105 ("Official acknowledgment ends all doubt[.]"). The President's tweet is subject to several plausible interpretations. From the Agency's perspective, the tweet simply asserts that the Post fabricated facts, a rather common complaint. So what else is new? The Agency argues that the possessive "my" just refers to the accusations of the story and that the adjectives are the President's editorial interpretations. BuzzFeed asserts the opposite. Assuming *arguendo* that the President ended *a* program, it is not clear *whose* program the President ended. "[M]y ending" could refer to the President terminating, directly or indirectly, the program of a foreign government or even a non-state actor. Oral Arg. 9:20–11:59. The tweet sheds little, if any, light. But we do not have to resolve this question.

Even if the President's tweet revealed *some* program, it did not reveal the existence of Agency records about that alleged program. BuzzFeed has failed to point to specific information that matches the information sought — the existence of Agency records and, therefore, its intelligence interest and capabilities. *See Wolf*, 473 F.3d at 378.

Our opinion in *ACLU* does not say otherwise. *ACLU* concerned whether the Agency could maintain a *Glomar* response about the Agency's interest in drone strikes following three official acknowledgments. 710 F.3d at 428–30. There, President Obama had "himself publicly acknowledged that the United States uses drone strikes against al Qaeda . . . on a live internet video forum." *Id.* at 429. President Obama's counterterrorism advisor went further, stating that "in deciding whether to carry out a strike, we draw on the full range of our intelligence capabilities and may ask the intelligence community to collect additional intelligence[.]" *Id.* at 430 (internal quotation marks and alterations omitted). The disclosures continued. The Director of the CIA stated in public remarks that "I can assure you that in terms of that particular area, it is very precise and it is very limited in terms of collateral damage[.]" *Id.* at 430. As we noted then, "[i]t is hard to see how the CIA Director could have made his Agency's knowledge of — and therefore 'interest' in — drone strikes any clearer." *Id.* "[T]hose statements are tantamount to an acknowledgment that the [Agency] has documents on the subject." *Id.* at 431. Based on the totality of these collective acknowledgments, we held that it was "neither logical nor plausible" for the Agency to deny an interest in drone strikes. *Id.* at 430.

The case before us is not comparable. "[T]he pertinent official statements in *ACLU* were far more precise, thorough, and numerous than those found here." *N.Y. Times v. CIA*, 965 F.3d 109, 119 (2d Cir. 2020). As we have discussed above, it is

not clear what, if anything, this short, informal post disclosed. The tweet never mentions the Agency at all, let alone its intelligence interest in, or capabilities to gather intelligence about, payments to Syrian rebels. *See* Donald J. Trump (@realDonaldTrump), Twitter (July 24, 2017, 10:23 PM). Whereas *ACLU*, 710 F.3d at 431, relied on specific statements revealing the Agency's interest, the district court here simply assumed that "it seems wildly unlikely that, in the eight and a half years since the Syrian civil war began, the Central Intelligence Agency has done no intelligence-gathering that produced a single record even *pertaining to* payments [to] Syrian rebels[.]" *Leopold II*, 419 F. Supp. 3d at 67. One would hope that the district court's assumption is accurate but who knows for sure? To establish official acknowledgment our precedents require certainty, not assumptions of this sort. *See Ameziane*, 699 F.3d at 492; *Afshar*, 702 F.2d at 1130. Whereas the official acknowledgments in *ACLU*, 710 F.3d at 430, could hardly have been "any clearer" about the Agency's intelligence interest, the tweet here leaves too much doubt. The district court erred in concluding otherwise.

For the foregoing reasons, we hold that President Trump's tweet was not an official acknowledgment of the existence (or not) of Agency records. Accordingly, the judgment of the district court is reversed.

*So ordered.*