# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 8, 2009   Decided January 8, 2010
          Reissued October 6, 2010
          Reissued October 5, 2012

No. 09-5236

DJAMEL AMEZIANE, DETAINEE, GUANTANAMO BAY NAVAL
STATION, GUANTANAMO BAY CUBA,
APPELLEE

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00392-UNA)

———

*August E. Flentje*, Attorney, U.S. Department of Justice,
argued the cause for appellants. With him on the briefs were
*Douglas N. Letter* and *Robert M. Loeb*, Attorneys.

*J. Wells Dixon* argued the cause for appellee. With him
on the brief were *Shayana D. Kadidal* and *Pardiss Kebriaei*.

Before: GINSBURG, BROWN and GRIFFITH, *Circuit
Judges*.

Opinion for the court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: This case presents another variation on the detainee theme, raising questions about what information concerning a detainee's status can be protected from public disclosure when the detainee is anxious to reveal it. These questions arise because the government, having decided that Djamel Ameziane may be released from detention at Guantanamo Bay, has sought to designate the decision of the Guantanamo Review Task Force as "protected" information under the governing protective order. The government wants to send Ameziane back to his native country, Algeria. Ameziane does not want to go. He wants to use his Task Force transfer decision to aid him in petitioning venues he deems more attractive, like Canada or France, for resettlement. The government—fearing that dozens of detainees going into business for themselves, utilizing Task Force transfer decisions to make their own best deals, would interfere with sensitive diplomatic efforts to relocate large numbers of detainees—moved to protect all Task Force transfer decisions from premature public disclosure. The district court sided with Ameziane and the government appealed. We reverse.

I

Ameziane, an Algerian citizen, has been held at the U.S. Naval Base at Guantanamo Bay, Cuba since 2002. In 2005, he filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. This action was subject to a protective order governing common procedural issues in all Guantanamo habeas cases. *See In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143 (D.D.C. 2008) (Protective Order). Under the Protective Order, "protected" information may not be disclosed to anyone other than the petitioner's counsel and the

court, unless the government authorizes wider disclosure. *Id.* at 151 (¶ 35). To designate information as protected, the government must attempt to reach an agreement with the petitioner's counsel, and if that fails, file a motion with the court. *Id.* (¶ 34).

On January 22, 2009, the President issued an Executive Order directing the closure of the Guantanamo detention facility "as soon as practicable, and no later than 1 year from the date of this order," and requiring "[t]he Secretary of State [to] expeditiously pursue and direct such negotiations and diplomatic efforts with foreign governments as are necessary and appropriate to implement this order." Exec. Order No. 13,492, 74 Fed. Reg. 4897, 4898–99 (Jan. 22, 2009). The Executive Order also established the Guantanamo Review Task Force (Task Force) and mandated immediate review of all detainees to "determine, on a rolling basis and as promptly as possible . . . whether it is possible to transfer or release the individuals consistent with the national security and foreign policy interests of the United States." *Id.* at 4899.

Although Ameziane had twice been deemed ineligible for release, on May 8, 2009, the Task Force issued a decision approving him for transfer. On June 15, the government filed a coordinated motion in the subset of Guantanamo habeas cases involving petitioners who had been issued transfer decisions, seeking to designate those decisions as "protected" information. In support of the motion, the government submitted a declaration by Ambassador Daniel Fried, the Special Envoy for the Closure of the Guantanamo Bay Detention Facility. Ambassador Fried explained that if these petitioners, in an effort to be resettled in European countries of their choice, all "approach the same small group of governments at the same time, particularly if they relay information about formal U.S. government decisions resulting

from review by the . . . Task Force, it could confuse, undermine, or jeopardize our diplomatic efforts with those countries and could put at risk our ability to move as many [detainees] to safe and responsible locations as might otherwise be the case." Fried Decl. ¶ 5.

At a hearing on June 30, the district court denied the government's motion to protect Ameziane's Task Force transfer decision. The court concluded the government had failed to make a "particularized showing" because the Fried Declaration had "nothing . . . to do with this case in particular," and protested that allowing Ameziane to disclose "this one piece of information" to foreign governments would not "interfere in anything." Transcript of Motion Hearing at 29, *Ameziane v. Obama*, No. 05-cv-392 (D.D.C. June 30, 2009) (June 30 Tr.). The court accused the government of "stand[ing] in the way of any possible, possible hope of something better for [Ameziane]" by seeking to repatriate him to Algeria rather than allowing him to use his Task Force transfer decision to advocate for resettlement in Canada or France. *Id.* at 30. The court issued a written order including a one-week stay. Order, *Ameziane v. Obama*, No. 05-cv-392 (D.D.C. June 30, 2009) (June 30 Order).

On July 7, the government sought to extend the stay for an additional week; the district court rejected the request, *see* Transcript of Motion Hearing at 28–29, *Ameziane v. Obama*, No. 05-cv-392 (D.D.C. July 7, 2009); and the government filed an interlocutory appeal and moved this court for an emergency stay of the district court's order.

The district court issued a written opinion explaining the refusal to extend its stay. Mem. Op. & Order, *Ameziane v. Obama*, No. 05-cv-392 (D.D.C July 8, 2009) (July 8 Op.). The court stated "[t]he government's rationale for protecting

[Ameziane's] clearance status [was] riddled with contradictions." *Id.* at 5. It disregarded the Fried Declaration because it "provide[d] no specificity as to why Ameziane's cleared status must be protected or why his counsel should be prohibited from using the information to advocate for his resettlement to other countries." *Id.* at 6. The court was not "convinced" by the government's "speculative and conclusory" national security concerns. *Id.* at 7. "Most importantly," the court determined, "the record demonstrates that protecting [Ameziane's] clearance status would serve little purpose" because "both the Red Cross and [his] brother in Canada are already aware that [he] has been cleared for transfer." *Id.*

On July 16, we granted a stay pending appeal.

II

We first consider whether we lack subject-matter jurisdiction because the dispute is moot or, alternatively, because the district court's order was not a final decision from which the government could immediately appeal.

A

Ameziane argues this appeal is moot because the Red Cross and his brother in Canada already know he has been cleared for transfer. "'Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies.'" *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). However,

a case is not moot unless it is "'impossible for the court to grant any effectual relief whatever.'" *Cody v. Cox*, 509 F.3d 606, 608 (D.C. Cir. 2007) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (internal quotation marks omitted)).

Although the Red Cross and Ameziane's brother may claim to know that Ameziane has been cleared for transfer, the government has not officially acknowledged his cleared status. "[I]n the arena of . . . foreign relations there can be a critical difference between official and unofficial disclosures." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990); *see also Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) ("[E]ven if a fact . . . is the subject of widespread media and public speculation, its official acknowledgment by an authoritative source might well be new information that could cause damage to the national security."). Presumably, nothing prevents the Red Cross or Ameziane's brother—or any other third party not bound by the Protective Order—from telling foreign governments that Ameziane has been cleared for transfer by the U.S. government. However, in the absence of any official acknowledgement, these foreign governments would be left guessing as to whether such information is true. *See Military Audit Project v. Casey*, 656 F.2d 724, 743–45 (D.C. Cir. 1981). Whereas third-party hearsay is likely to be dismissed as mere rumor or self-serving speculation, foreign governments are substantially more likely to rely on an official statement by the U.S. government.

Thus, this appeal is not moot if the district court's order would result in an official acknowledgement of Ameziane's cleared status. It would. The district court ordered, first, "that petitioner's motion to unseal" the "government's approval of petitioner[] for transfer and all related or

derivative documents" would be granted; second, "that the government's motion to designate petitioner's clearance for transfer . . . as 'protected' information" would be denied; and third, that "petitioner and his counsel may publicly disclose that he has been approved for transfer from Guantanamo by the . . . Task Force." June 30 Order at 1–2.

As an initial matter, in this court, Ameziane has decided not to defend much of the district court's order: "[Ameziane] does not seek to disclose the District Court pleadings or transcripts regarding this issue, or the parties' appellate briefs, or any information regarding the government's attempts to repatriate him to Algeria. . . . [A]ll that is at issue in this appeal, is whether Ameziane 'may publicly disclose that he has been approved for transfer from Guantanamo by the . . . Task Force.'" Appellee's Br. 17 (quoting June 30 Order at 2). Accordingly, since both parties agree "the District Court pleadings [and] transcripts regarding this issue," "the parties' appellate briefs," and "any information regarding the government's attempts to repatriate him to Algeria" should be protected, *id.*, the district court's order is reversed to the extent it unsealed and declined to protect such material.

There remains one key document that, if unsealed, would clearly constitute an official acknowledgement of Ameziane's cleared status: the district court order itself. However, there is some ambiguity whether Ameziane seeks to unseal this order. He quotes from the order in arguing his entitlement to "'publicly disclose that he has been approved for transfer,'" Appellee's Br. 17 (quoting June 30 Order at 2), thus suggesting Ameziane's counsel intends to point to the order itself in negotiations with foreign governments, perhaps to corroborate his claim that Ameziane has been cleared for transfer.

Yet, at oral argument, Ameziane's counsel stated he was "not seeking the unsealing of records." Transcript of Oral Argument at 15:13–16. It is not clear whether this reference to "records" included the district court order, or whether it referred only to the documents listed in Ameziane's brief and discussed above. But even assuming the district court order will remain sealed, this appeal is not moot. Counsel stated unambiguously that he sought "to be able to say that Mr. Ameziane has been approved for transfer by the Task Force." *Id.* at 15:22–25, 16:1–3. Ameziane's counsel is an officer of the court, subject to the serious ethical obligations inherent in that position. Although foreign governments would be unlikely to rely on a claim by a third party—or even by Ameziane himself—that Ameziane has been cleared for transfer, the same is not true with respect to a similar representation made by counsel. As an officer of the court, any statement by counsel that the Task Force has cleared Ameziane for transfer would be tantamount to, and a sufficient substitute for, official acknowledgement by the U.S. government. Accordingly, this appeal is not moot because we can grant "effectual relief" by reversing the district court and thereby preventing official acknowledgement of Ameziane's cleared status—either from the order itself, or from disclosures by counsel that the order permits him to make.

B

Nor do we lack jurisdiction because the district court's order was not "final." Courts of appeals have jurisdiction of appeals from "all final decisions" of district courts. 28 U.S.C. § 1291. Pursuant to the collateral order doctrine, an interlocutory order qualifies as "final" under § 1291 if it (1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a

final judgment. *See Will v. Hallock*, 546 U.S. 345, 349 (2006).

These conditions, though "stringent," *see id.*, are satisfied in this case. As Ameziane concedes, the first requirement is satisfied because the district court's order conclusively determined that his Task Force transfer decision would not be protected under the Protective Order. Second, this issue is entirely separate from the merits of Ameziane's habeas action. The public disclosure of Ameziane's Task Force transfer decision has no relevance to the underlying question on the merits, *i.e.*, whether he has been lawfully detained. And given the foreign relations and national security concerns raised in the Fried Declaration, we have no difficulty finding this issue sufficiently "important" to warrant immediate appellate review. *See Al Odah v. United States*, 559 F.3d 539, 543–44 (D.C. Cir. 2009) (holding that order mandating disclosure of classified information to habeas petitioners' counsel was "an important issue entirely separate from the merits of this case"). Finally, the district court's order would be effectively unreviewable on appeal from a final judgment because once the government's official acknowledgement of Ameziane's cleared status is revealed publicly, the disclosure cannot be undone. *See id.* at 544. Thus, we have subject-matter jurisdiction.

III

While we review a district court's decision to seal or unseal documents, or to issue or refuse to issue a protective order, for abuse of discretion, we review de novo any errors of law upon which the court relied in exercising its discretion. *See, e.g.*, *United States v. Mejia*, 448 F.3d 436, 456–57 (D.C. Cir. 2006) (reviewing issuance of protective order de novo rather than for abuse of discretion because court applied

incorrect legal standard); *United States v. El-Sayegh*, 131 F.3d 158, 160 (D.C. Cir. 1997) (reviewing decision to unseal guilty plea de novo rather than for abuse of discretion because court's decision was premised on legal error); *see also Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."). Here, the district court's explanations indicate de novo review is appropriate.

A

It is "our customary policy" to accord "deference to the President in matters of foreign affairs." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 348 (2005). And "consistent with our rule of deference, it is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role." *Bismullah v. Gates*, 501 F.3d 178, 187–88 (D.C. Cir. 2007) (internal quotation marks omitted), *vacated on other grounds*, *Gates v. Bismullah*, 128 S. Ct. 2960 (2008).

But detainee cases are unique. Because of the independent role carved out for the judiciary, and our concomitant obligation to balance the needs of the government against the rights of the detainee, and also to preserve to the extent feasible the traditional right of public access to judicial records grounded in the First Amendment, we exercise greater caution in deciding to defer. *See, e.g.*, *Boumediene v. Bush*, 128 S. Ct. 2229, 2276–77 (2008). In the context of requests by the government to protect sensitive information, we have explained the showing the government must make to trigger judicial deference.

In *Bismullah v. Gates*, we rejected the government's assertion of unilateral authority to designate information as "protected" and held "the Government must give the court a basis for withholding . . . from public view" nonclassified information it seeks to protect. 501 F.3d at 188. In *Parhat v. Gates*, we explained that a valid "basis for withholding" would include, at a minimum, a "specific," "tailored" rationale for protecting a general category of information, and a precise designation of each particular item of information that purportedly "falls within the categor[y] . . . described." 532 F.3d 834, 853 (D.C. Cir. 2008). In other words, the government first must demonstrate *what kind* of information requires protection and *why*, and then must show exactly *what* information in the case at hand it seeks to protect.

In *Parhat*, the government failed to satisfy this twofold showing. The government began by describing two broad categories—"(1) any names and/or identifying information of United States Government personnel, and (2) any sensitive law enforcement information"—and provided a "rationale for protection [that was] brief" and "relie[d] solely on spare, generic assertions of the need to protect information in the two categories." *Id.* at 852–53 (internal quotation marks omitted). For instance, the government merely asserted in conclusory fashion that disclosing information in the first category would "heighten[]" the risks to the safety of U.S. government personnel, and that disclosing information in the second category would "harm the Government's ongoing law enforcement activities related to the global war against al Qaeda and its supporters." *Id.* at 852. These "generic claims" failed to satisfy the government's burden of providing "an explanation tailored to the specific information at issue." *Id.* at 853.

Second, the government consigned all government personnel mentioned in the record to the first category, and simply marked documents "Law Enforcement Sensitive" or "LES" to designate the second category. *Id.* at 852–53. We found both sets of designations imprecise and overinclusive. For instance, "some 'U.S. Government personnel' . . . [were] so publicly associated with Guantanamo that protected status would plainly be unwarranted." *Id.* at 853. And we noted that the term "Law Enforcement Sensitive" was so vague that "at least seven different federal agencies define[d] it differently." *Id.* Thus, even if the government had provided sufficient rationales for protecting information in the two categories, it nonetheless failed to make its designations with sufficient precision to allow the court to "determine whether the information it ha[d] designated properly f[ell] within the categories it ha[d] described." *Id.*

Here, the district court failed properly to apply *Parhat*'s two-part standard. Rather than evaluating the government's proposed category and proffered rationale, and then determining whether Ameziane's Task Force transfer decision fell into that category, the court faulted Ambassador Fried for "provid[ing] no specificity as to why *Ameziane's* cleared status must be protected or why *his* counsel should be prohibited from using the information to advocate for his resettlement in other countries." July 8 Op. at 6 (emphasis added). Similarly, in its oral ruling, the court found the government had failed to make a "particularized showing" because the Fried Declaration had "nothing . . . to do with this case in particular." June 30 Tr. at 29. However, *Parhat* did not require the government to provide a rationale for protection that was so specific as to preclude any generalized categorization. Rather, *Parhat* left room for categorized requests in appropriate circumstances. Of course, the narrower the category for which the government seeks

protection, the more likely the government's rationale will be sufficiently tailored. But the district court erred by construing *Parhat* to require a specific and distinct rationale addressed to each detainee's situation.

There is a sharp contrast between the government's showing in this case and its showing in *Parhat*. Unlike the two broad categories outlined in *Parhat*, here the government requested protection for a single, limited category: Task Force transfer decisions and all related or derivative documents. *See* July 8 Op. at 2. And unlike the "spare, generic assertions" with which the government justified its request in *Parhat*, 532 F.3d at 853, here the government provided a detailed rationale tailored specifically to the information in the narrow category.

The Fried Declaration logically explained why failing to protect Task Force transfer decisions was likely to harm the government's foreign relations and national security interests. To close down Guantanamo, as Executive Order 13,492 commands, the government faces not just the task of deciding which detainees may be released, but also the formidable hurdle of determining where to send those who are cleared for transfer. Fried Decl. ¶¶ 1–4. Because of U.S. policies barring the transfer of detainees to countries where they face torture, "there are certain individuals who have been (or will be) approved for transfer out of U.S. custody but who . . . cannot be safely and/or responsibly returned to their home countries." *Id.* ¶ 3. At the same time, since our foreign allies—particularly in Europe, where many detainees wish to be sent—have limited "capacity to absorb detainees . . ., it is important to the U.S. goal of closing Guantanamo to be able to focus diplomatic discussions with those countries on detainees for whom there is a compelling reason not to return them to their home countries." *Id.* ¶ 5. This goal would be

frustrated if "dozens of detainees approach the same small group of governments at the same time, . . . relay[ing] information about formal U.S. government decisions resulting from review by the . . . Task Force." *Id.* A "coherent diplomatic strategy"—a necessity if the government is going to "move as many [detainees] to safe and responsible locations" as possible—requires that the government "retain the prerogative to 'speak with one voice.'" *Id.* ¶¶ 4–6. But permitting persons not authorized to speak on behalf of the government to "convey[] official U.S. Government information to a foreign country regarding the transfer status of a particular petitioner . . . has the potential to create confusion and mixed messages." *Id.* ¶ 6. Because this detailed rationale was tailored specifically to the narrow category of information for which the government requested protection, the government satisfied the first showing required by *Parhat*.

The government also satisfied the second part of the *Parhat* standard because we face no difficulty "determin[ing] whether the information [the government] has designated properly falls within the categor[y] it has described." *Parhat*, 532 F.3d at 853. The government designated for protection a precise item of information—Ameziane's transfer decision—that indisputably falls into the narrow category of Task Force transfer decisions. Indeed, this case fits squarely within the government's rationale for protection. Although the government has determined Ameziane can safely be repatriated to Algeria, he is seeking to obtain resettlement in Canada or France, and wishes to utilize his Task Force transfer decision to aid him in petitioning these foreign governments. As the Fried Declaration explains, permitting Ameziane to make such use of the government's official information would interfere with the Secretary of State's efforts to focus the Canadian and French governments on

accepting detainees who, unlike Ameziane, cannot safely be repatriated to their home countries. Thus, the government met its burden for protection under *Parhat*.

B

Because the government satisfied *Parhat*, the district court was required to defer to the government's assessment of the harm to foreign relations and national security that would result from officially disclosing Ameziane's Task Force transfer decision. As we explained in *Fitzgibbon*, the failure to give deference when it is due is error. 911 F.2d at 755. There, pursuant to a Freedom of Information Act request, the district court ordered the CIA to disclose information about a former CIA station location, over the CIA's objection that such disclosure would cause harm to national security. *Id.* at 758–59. We faulted the district court for "essentially perform[ing] its own calculus as to whether or not harm to the national security . . . would result from disclosure" of the information, and held it should have "accord[ed] substantial weight and deference" to the Executive Branch's "determination of possible harm." *Id.* at 766. Thus, "declin[ing] to adopt the abuse-of-discretion review that [the plaintiff] urge[d] upon us," we reversed. *Id.*

Here, the district court simply declared:

I don't understand how [declining to protect Ameziane's Task Force transfer decision] will interfere in anything. . . . I don't know why in the world the only thing that the government can see is Algeria here. . . . But if [Ameziane] is able to do better than what the government is doing, I say fine. He has now been there seven years thanks to the United States government. Why they want to stand

> in the way of any possible, possible hope of something better for him baffles me. . . . This gentleman has the perhaps glimmer of hope that something could get slightly better and he won't be prosecuted again in Canada. Why should we stand in the way after the way we've treated him for these seven years?

June 30 Tr. at 29–30; *see also* July 8 Op. at 7 (rejecting as "speculative and conclusory" government's "arguments that the release of [Ameziane's] clearance status would cause significant harm to the interests of the government"). It is not entirely clear why the district court found the Fried Declaration so baffling. As discussed above, it provided a detailed and logical explanation of the impact of premature disclosure on the government's foreign relations and national security interests. *Parhat* did not free courts to substitute their own policy judgments for those of the executive. The district court was not entitled to toss the Fried Declaration aside merely because it disagreed with its premise. Deference required acknowledging that the State Department, not the judiciary, is tasked with undertaking the diplomatic negotiations necessary to close down Guantanamo, and that the Executive Branch officials bearing this responsibility possess far greater resources and aptitude than the judiciary for determining what will aid, and what will undermine, their mission. The district court's inability to "understand" how permitting Ameziane to disclose his Task Force transfer decision to foreign governments "will interfere in anything," June 30 Tr. at 29, did not license the court to "perform[] its own calculus as to whether or not harm to the national security . . . would result from [the] disclosure," *Fitzgibbon*, 911 F.2d at 766.

In particular, the district court erred by elevating Ameziane's interest in being resettled in a country of his choice over the government's interest in repatriating or resettling as many detainees as possible as quickly as practicable in order to close Guantanamo as the President directed. Such prioritizing was an executive prerogative, and it was "not within the role of the [district] court[] to second-guess executive judgments made in furtherance of that branch's proper role." *Bismullah*, 501 F.3d at 187–88 (internal quotation marks omitted). Crucially, this does not mean Ameziane never will have the opportunity to share his Task Force transfer decision with Canada, France, or other countries he wishes to petition for resettlement. Rather, it means only that those foreign governments must contact the U.S. government and obtain the information through official channels. In this way, Ameziane's eagerness to be sent to a country of his choice will not undermine the Executive Branch's prerogative to "speak with one voice" in diplomatic affairs. *See* Fried Decl. ¶ 6. The failure to accord "substantial weight and deference," *Fitzgibbon*, 911 F.2d at 766, to the government's assessment of its foreign relations and national security interests was error.

## C

Finally, the district court erred by basing its ruling on an inappropriate factor. The court held that the "[m]ost important[]" factor weighing against the government's request for protection was that "protecting [Ameziane's] clearance status would serve little purpose" because "both the Red Cross and [his] brother in Canada are already aware that [he] has been cleared for transfer." July 8 Op. at 7. The first problem with the district court's approach is the incentive it gives detainees to violate the Protective Order. Why honor confidentiality restrictions imposed by the court if ignoring

them will be rewarded? Moreover, as discussed above, there is a distinction between third parties claiming to have knowledge of certain information, and an official acknowledgement of the truth of that information by the U.S. government. *See Fitzgibbon*, 911 F.2d at 765 (observing the "critical difference between official and unofficial disclosures" in the "arena of . . . foreign relations"); *Afshar*, 702 F.2d at 1130 (noting that "official acknowledgment by an authoritative source" of a fact that "is the subject of widespread media and public speculation" may "be new information that could cause damage to the national security"). For the same reason that a "public record" is generally admissible as evidence, *see* FED. R. EVID. 803(8), while other hearsay is not, *see* FED. R. EVID. 802, an official acknowledgment of a fact is far more reliable than a third party's statement of the same fact. This is doubly true in the world of diplomatic relations.

Indeed, any suggestion the government's official acknowledgment—either from the district court's order itself or from Ameziane's counsel in his capacity as an officer of the court—would not produce a material change in circumstances is belied by Ameziane's vigorous defense of the district court's ruling. It is evident that while the Canadian and French governments would pay scant attention to Ameziane's brother's claim that Ameziane has been cleared for transfer, they would be substantially more interested in hearing this same news from a person or entity speaking on behalf of the U.S. government. Thus, while it would have been proper to consider whether the government already had publicly acknowledged Ameziane's clearance for transfer, it was error to rely on third parties' purported knowledge of his cleared status.

19

IV

For the foregoing reasons, the government's motion to designate Ameziane's Task Force transfer decision as "protected" information under the Protective Order should have been granted.  Thus, the order of the district court is

*Reversed.*